UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION


UNITED STATES OF AMERICA,           )
                                    )
              Plaintiff,            )
                                    ) Case No.
         vs.                        ) 14−CR−3106−MDH−5
                                    )
                                    )
ANTHONY J. VAN PELT,                )
                                    )
              Defendant.            )


SENTENCING
BEFORE THE HONORABLE M. DOUGLAS HARPOOL
WEDNESDAY, MAY 31, 2017; 1:30 P.M.
SPRINGFIELD, MISSOURI


APPEARANCES:

FOR THE PLAINTIFF:          MR. RANDALL D. EGGERT
                            UNITED STATES ATTORNEY'S OFFICE
                            901 St. Louis, Ste. 500
                            Springfield, MO 65806


FOR THE DEFENDANT:          MR. KEVIN O'BRIEN
                            THE LAW OFFICES OF KEVIN O'BRIEN
                            28 N. Eighth Street, Ste. 512
                            Columbia, MO 65201

                            MR. CHRISTOPHER FREIBURGER
                            FREIBURGER LAW FIRM LLC
                            4558 Osage Beach Pkwy, Ste. 106
                            Osage Beach, MO 65065

COURT REPORTER:             MS. JEANNINE RANKIN, RPR, CSR
                            UNITED STATES DISTRICT COURT
                            222 N. Hammons Parkway
                            Springfield, MO 65806


    Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1                    USA v ANTHONY J. VAN PELT

 2                      CASE NO. 14-3106-MDH-5

 3                            SENTENCING

 4                           May 31, 2017

 5                      *   *   *   *   *   *

 6          THE COURT:  We are here to sentence Anthony J. Van

 7   Pelt.

 8          Who appears on behalf of the United States?

 9          MR. EGGERT:  Randy Eggert for the United States,

10   Your Honor.

11          THE COURT:  And on behalf the defendant?

12          MR. O'BRIEN:  Kevin O'Brien and Chris Freiburger for

13   the defendant, Your Honor.  Defendant appears in person.

14          THE COURT:  Mr. Van Pelt, would you stand.

15          My name is Doug Harpool.  It's my responsibility

16   this afternoon to sentence you for the crimes you've

17   committed.

18          The law instructs me to sentence you to a sentence

19   which is sufficient but not greater than necessary to meet the

20   objectives of the U.S. sentencing laws.  So the first thing

21   we'll do is we'll talk with the lawyers about what the law

22   provides for a authorized sentence for the crimes you've

23   committed.  We'll then talk about the U.S. Sentencing

24   Guidelines manual and we will assign an offense level to you

25   and a criminal history category and determine what the U.S.
```

                                    2

1  Sentencing Commission suggests would be a guideline sentence

2  for someone who's committed the crimes you've committed under

3  the circumstances applicable.  When that's done, we'll then

4  talk about factors described at Title 18, Section 3553(a) that

5  allow this Court to depart or vary from that guideline

6  sentence upward or downward based on the specific factors

7  described at that portion of the law.

8          After the lawyers and I have discussed those three

9  topics and the lawyers have had an opportunity to make

10  whatever recommendation to me they want and present whatever

11  information to me they may want, I'll afford you an

12  opportunity to say something to me, if you want to.  You do

13  not have to say anything.  You can remain silent if you want

14  to.  But if you want to say something, I'll afford you that

15  opportunity.

16          When you're finished, I'll make a final decision on

17  what your sentence should be and I'll announce it to you and

18  I'll explain what I'm thinking and why I've come to the

19  conclusion that I've come to.

20          Before I entered the courtroom, I have read

21  everything that has been submitted to me.  That includes some

22  briefing by lawyers, the presentence investigation report,

23  some letters that were submitted in support of you from those

24  that you've had a positive influence in their life, but I've

25  not made any final decision and I won't make a final decision

3

1    until we've completed each of the steps that I follow.

 2              You understand what we're going to do?

 3              THE DEFENDANT:  Yes, sir.

 4              THE COURT:  All right.  Go ahead and be seated and

 5    we'll get started, then.

 6              All right.  Counsel, the defendant has been guilty

 7    of two crimes that he's here to be sentenced for.  The first

 8    under Count 1 is conspiracy to distribute 500 grams or more of

 9    a mixture or substance containing a detectible amount of

10    methamphetamine.  That is a Class A felony.  And the Court

11    believes that the authorized sentence by the U.S. Congress

12    would be a sentence of not less than 20 years and as long as a

13    possibility of life imprisonment, a supervised release of not

14    less than ten years and as long as life, then payment of a

15    $100 special assessment.

16              Any disagreement that that is the

17    congressionally-authorized sentence on Count 1?

18              MR. EGGERT:  No, Your Honor.

19              MR. O'BRIEN:  No, sir.

20              THE COURT:  On Count 27, the crime of distribution

21    of 50 grams or more of a mixture or substance containing a

22    detectible amount of methamphetamine, Class B felony, the

23    authorized sentence is a sentence of not less than ten years

24    and as long as 40 years in prison, a possible fine up to $8

25    million, supervised release of not less than four years, and a

4

1   $100 mandatory special assessment.

2           Any disagreement that that is the authorized

3   sentence on Count 27?

4           MR. EGGERT:  None from the government, Your Honor.

5           MR. O'BRIEN:  No, Your Honor.

6           THE COURT:  So that's what the Congress has said

7   that -- of course, I have to give you a sentence that is

8   something that is authorized by law by the Congress.

9           So now we're going to look at the U.S. Sentencing

10  Guidelines.  That's this big thick book here.  As it works to

11  apply the guidelines -- first of all, you need to know they're

12  used in every federal district court in the United States by

13  order of the Supreme Court -- or by rule of the Supreme Court,

14  and it requires me as the judge to assign an offense level to

15  you and a criminal history category to you.  Then we'll look

16  at the chart that's in the back of the book and upon one

17  column is the offense level and across the top is a criminal

18  history category, and what I do is see where you fit down the

19  column and where you fit across the columns, then we see where

20  the two meet in the chart.  That's the U.S. Sentencing

21  Commission's guideline sentence for you.  Again, it's used by

22  judges all across the country by requirement.  It's supposed

23  to provide us more consistency of sentencing.

24          At one time the guideline sentence was mandatory.

25  It's no longer.  As I told you, later we'll talk about whether

5

1    there's reason for a variance or departure in your case.

2          The presentence investigation report did a

3    calculation of what your offense level and criminal history

4    category should be and it reached the conclusion that your

5    offense level is 37 and that your criminal history category is

6    four.  As I told you, six is the highest.  So you would be a

7    four.  Then the columns, it goes down past 37 but we would

8    stop at the 37 line, but I believe there are objections

9    pending to that from your lawyer.

10          Do you wish to be heard on those?

11          MR. O'BRIEN:  As far as the --

12          THE COURT:  Offense level or the criminal history

13    category.

14          MR. O'BRIEN:  Your Honor, I think we came to an

15    agreement on the criminal history category where I think the

16    PSI settled at nine, which is criminal history category.

17          THE COURT:  Nine points?

18          MR. O'BRIEN:  Yes.

19          THE COURT:  Which is a category of four?

20          MR. O'BRIEN:  Yes.

21          THE COURT:  Okay.

22          MR. O'BRIEN:  So I don't think we have an objection

23    to that at this time.

24          With regards to the offense level, Your Honor, there

25    are some issues with that we'd like to bring to the Court's

6

1   attention that we've noted.

 2              THE COURT:  You may do so at this time.

 3              MR. O'BRIEN:  Okay.  Your Honor, with regards to the

 4   offense level here, as the Court noted, the base offense level

 5   identified here was for an offense involving more than

 6   45 kilograms of methamphetamine, and I know the Court's

 7   probably noted in Mr. Van Pelt's factual basis at the time of

 8   the plea and then also in the statement -- in the government's

 9   defense memorandum -- or the government's sentencing

10   memorandum, that number is sort of identified but it seems

11   like in all of these things that number is identified as an

12   amount of drugs in the global conspiracy throughout the life

13   of the conspiracy.  And I think as we've tried to explain in

14   our sentencing memorandum, it's our position that Mr. Van Pelt

15   and even Mr. Stienbarger and Mr. Malen, their involvement was

16   at a much later date in this conspiracy.

17              I mean, we believe that based on admissions made by

18   even Kenna Harmon -- and we've referenced those in our

19   sentencing memorandum -- that Mr. Van Pelt's entry into this

20   conspiracy was in late August of '14 and then, of course,

21   there was an arrest in late November of '14.  And this is a

22   conspiracy globally that expands years that was actively

23   investigated by law enforcement for years.

24              I mean, our position essentially is that Mr. Van

25   Pelt's responsibility as a co-conspirator would be

                              7

significantly less because we would ask the Court to consider
the calculation from the time of his entry into the conspiracy
rather than saying that he is responsible for things that
happened before he ever met Kenna Harmon, met anybody in the
conspiracy, I mean -- or certainly even entered into it
because we believe the evidence is also clear that there was a
time where Mr. Van Pelt had met Ms. Harmon but he certainly
wasn't involved in any kind of illegal activity with her.

      THE COURT:  The paragraph in the presentence
investigation, you're talking about Paragraph 46 which is the
base offense level, it currently assigns a 38 level and you
say that's based on a 45-kilogram quantity.  What quantity is
the defendant's position should be used and what would that
base offense level be?

      MR. O'BRIEN:  Your Honor, I mean, looking at the
material that we've seen in discovery as far as what's been
captured on wiretaps, drugs that were recovered at the time of
Mr. Van Pelt's arrest and other activities in August that I
think are referenced in the sentencing memorandums, we believe
a range of 5 to 15 kilograms would be appropriate, which would
put a base offense level of 34.

      THE COURT:  So it would make a four-level
difference.

      MR. O'BRIEN:  It would, Your Honor.  Again, when we
look at this and consider this, we believe that base offense

```
 1  level 38 reflects the entire scope of this conspiracy, again,
 2  which was multi years.  We believe it's well settled at
 3  least -- I mean, I think one fact is well settled, that
 4  Mr. Van Pelt's entry into this conspiracy was in August of '14
 5  and, again, the arrest was in November of '14.  So a
 6  significantly smaller -- his involvement was in a
 7  significantly smaller portion than the entire conspiracy.
 8           THE COURT:  Just a second.  Let me look.
 9           All right.  So you would put -- you're using the
10  number for 5 kilograms -- more than 5 but less than 15?
11           MR. O'BRIEN:  That would be our --
12           THE COURT:  -- of meth?
13           MR. O'BRIEN:  That would be our assertion.
14           THE COURT:  All right.
15           Mr. Eggert, what's the government's response to that
16  objection?
17           MR. EGGERT:  We disagree, Your Honor.  If I may have
18  a few minutes to describe our reason for disagreement, if
19  that's okay?
20           THE COURT:  Yeah.  Sure.
21           MR. EGGERT:  Your Honor, we believe the level of --
22  that the probation office indicated that a 38 is the correct
23  level.  I will note for purposes of the sentencing guidelines
24  to kind of get right to the nub of the matter, in the
25  application notes on Section 1B1.3, Application Note 3B
```

9

talking about scope, in the third paragraph it states the

following:  A defendant's relevant conduct does not include

the conduct of members of the conspiracy prior to the

defendant joining the conspiracy even if the defendant knows

of that conduct, i.e., in the case of the defendant who joins

an ongoing drug distribution conspiracy knowing it has been

selling 2 kilograms of cocaine per week, the cocaine sold

prior to the defendant joining the conspiracy is not included

as relevant conduct in determining the defendant's offense

level.

        So I agree with the initial statement that the

relevant conduct has to be determined based on when the

defendant joined the conspiracy.  The earliest date that this

defendant -- we have evidence that he joined the conspiracy

was in August of 2014 when he engaged in a transaction

involving Corey Stienbarger and an individual that came from

St. Louis.  Also there was telephone communication that took

place in September of 2014 that also indicates that the

defendant was involved in the distribution of methamphetamine

that was associated with the conspiracy.  So I'll take for

granted in this particular argument that we start determining

relevant conduct beginning in August of 2014.

        What the defendant is asking you to do is limit your

relevant conduct determination to only those amounts of drugs

that were seized during the time of the conspiracy, not taking

10

1   into account that during this entire conspiracy framework
2   drugs are also being distributed.

3           I have calculated just in the rough notes I've taken
4   over the last few minutes after talking to Mr. O'Brien about
5   this issue that on August, I believe, 19th of 2014,
6   Mr. Van Pelt was responsible for the distribution of 450 grams
7   of methamphetamine through Corey Stienbarger, in November of
8   2014, I think around November 15th of 2014, Mr. Van Pelt was
9   responsible for the distribution of approximately 500 grams of
10  methamphetamine to Kenna Harmon which was a normal amount that
11  he distributed to her, according to the wiretap, and he did
12  that through the assistance of Brandon Malen at the house that
13  Mr. Van Pelt had Mr. Malen store methamphetamine at in
14  Springfield, Missouri.  So right there we have 1 kilogram,
15  approximately, of methamphetamine distributed just on those
16  two transactions.

17          Then you go to the actual seizures that took place.
18  In the end of November of 2014 we have a seizure of
19  approximately 900 grams of methamphetamine from Joe Allen on
20  November 27th of 2014.  In addition, we have an other
21  seizure -- and these are all referenced, by the way, in the
22  presentence report.  I apologize for not calling them to the
23  specific location in the presentence report.  But Mr. Allen's
24  seizure is referenced in Paragraph 35 of the presentence
25  report.  There is also a seizure of methamphetamine from Kenna

```
 1    Harmon's residence on November 27th of 2014.  That seizure
 2    was --
 3                THE COURT:  Five pounds, wasn't it?
 4                MR. EGGERT:  Yes.  I'm trying to find it here.  I
 5    know it's either referenced in the presentence report or in
 6    the sentencing memorandum.  But the amount that was seized
 7    from Ms. Harmon's residence was approximately 5 pounds of
 8    methamphetamine which equals to about 2.5 kilograms of -- 2.4
 9    kilograms of methamphetamine that was also seized.
10                THE COURT:  Paragraph 40, I believe.
11                MR. EGGERT:  Thank you, Your Honor.  I apologize.
12                THE COURT:  It's 5.5 pounds.
13                MR. EGGERT:  Then in addition at Mr. Van Pelt's
14    residence, which is the residence that Mr. Malen was providing
15    to him, there was seized on that same day another
16    1.5 kilograms of methamphetamine from Mr. Van Pelt.
17                So just based on seizures that took place on
18    November 27th of 2014, we have almost -- actually right at
19    5 kilograms right there.  So that in addition to the 1
20    kilogram that was sold by Mr. Van Pelt in August and September
21    of 2014 gets us above the 5-kilogram threshold that
22    Mr. O'Brien refers to.
23                But then we also have the money that was seized.  We
24    have a statement by Mr. Van Pelt that is referenced in my
25    sentencing memorandum in the section that is the factual
```

statement that Mr. Van Pelt signed when he pled guilty, he
indicated that he had distributed 450 grams of methamphetamine
with Corey Stienbarger in exchange for $14,000 of United
States currency.  So that pegs the approximate value that
Mr. Van Pelt was selling methamphetamine at at about $14,000
per half kilogram.

During the total course of this investigation there
was seized from various defendants approximately $57,000 of
United States currency.  So if you -- $34,000 of that was
seized from Mr. Friend on November 27th and $23,000 was seized
from Mr. Van Pelt on November 27th.  So if you add those two
figures together, that comes to approximately $57,000, which
would be approximately 2 kilograms of methamphetamine if you
factor that in as $14,000 a half key, or $28,000 for a
kilogram.  So that gets us now way over the 5-kilogram
threshold which gets us to a base offense level of 34.

However, the Court's well aware from the previous
sentences that have taken place in this case that ongoing
transactions were taking place from the time that Mr. Van Pelt
joined the conspiracy to the end of the conspiracy, which was
much more than the amount of methamphetamine that was actually
seized.  So I believe that it's reasonably foreseeable for
this defendant to have been aware that more than 7 kilograms
of methamphetamine was being distributed by this conspiracy.
The totality of the conspiracy was distributing in excess of

13

1  45 kilograms of methamphetamine and I think the record or the

2  facts from not only this particular hearing but the other

3  hearings the Court's held in this case support that this is a

4  reasonable and conservative estimation of the scope and the

5  breath of this conspiracy.

6          If the Court is concerned about attributing to

7  Mr. Van Pelt the entire 45-kilogram amount, he should not be

8  just held to the 5-kilogram amount.  Go to the next level,

9  level 36, which is 15 kilograms or more of a mixture or

10 substance containing methamphetamine.

11         I think it is reasonably foreseeable based upon what

12 this defendant pled guilty to and the totality of the

13 circumstances of this case that it was reasonably foreseeable

14 to this defendant that he was joining a large-scale,

15 wide-ranging methamphetamine conspiracy that involved much

16 more methamphetamine being distributed than just that that was

17 seized by the police on November 27th of 2014.  So we don't

18 believe in this particular case there is a need to change the

19 presentence investigative report.  We think it was accurately

20 determined.

21         THE COURT:  All right.  I want to ask you about

22 paragraph -- Stienbarger, it's my understanding, is someone

23 who we believe was controlled by the defendant, right?

24         MR. EGGERT:  Yes, that is correct.

25         THE COURT:  Looking at Paragraph 28, says,

14

1    "Stienbarger was paid a thousand dollars per trip to go to

2    Kansas City whereby he picked up 4 to 6 pounds per trip."

3            MR. EGGERT:  Yes, and I should have pointed that

4    out.

5            THE COURT:  Do we know how many trips he took or how

6    often he took it?

7            MR. EGGERT:  I do not have that information here and

8    Mr. Stienbarger is not available to testify on that matter, so

9    we are limited to what is said in the presentence

10   investigative report.  But even if he was limited to just

11   making one trip, he made one trip when he picked up 4 to 6

12   pounds of methamphetamine, which is about 2 to 3 kilograms of

13   methamphetamine, he also delivered $20,000 of United States

14   currency, according to Paragraph 28, which would equivocate to

15   about -- again, if you use $14,000 for half a key as a

16   threshold point, you're talking about close to three-quarters

17   of a kilogram of methamphetamine right there.  So that's also

18   an additional factor to consider.

19           The government -- and I don't -- I can't put my

20   finger as to where in the commentary it actually says this but

21   I do believe I can say with some assurance that the commentary

22   says the government doesn't have to come up with a precise

23   figure as to exactly how much methamphetamine was distributed;

24   all the government has to show by a preponderance standard in

25   this particular situation is that the defendant should have

                                    15

1    been reasonably aware that more methamphetamine was being

2    distributed than that that he was personally responsible for

3    and it can be supported that it reaches the level that the

4    Court finds reasonable, which in this case we still argue

5    would be 45 kilograms.

6              That's all I have, Your Honor.  Thank you.

7              THE COURT:  You want to be heard further?

8              MR. O'BRIEN:  Your Honor, I would simply point out

9    to the Court's attention that it does seem that some of these

10   allegations, especially the ones involving Mr. Stienbarger and

11   Mr. Van Pelt's dealings with Ms. Harmon, there seems to be a

12   great potential it double counts some of these drug quantities

13   and some of this money since the allegations were and the plea

14   was that Mr. Van Pelt did provide drugs to Ms. Harmon in

15   exchange for money.  I mean, to say that, Well, we're going to

16   add on Mr. Stienbarger's total in addition, seems to double

17   count the amount.

18             Now, I would simply say that I agree with the State

19   that, you know, maybe there are -- there is some confusion

20   about this and it is -- the burden of proof is a preponderance

21   of the evidence, Your Honor, but I would also submit to the

22   Court that there's a tremendous difference between 15

23   kilograms and 45 kilograms.  From everything that I've seen

24   here, it would seem that Mr. Van Pelt's numbers are lower.

25   Now, does that bring us down to a 34 as suggested by the

                                  16

defense?  You know, perhaps the Court would not find that
compelling.  But I certainly think that our point that it
would be something lower than the 45-kilogram threshold is
legitimate based on the evidence that we see.

THE COURT:  Here's what I'm going to do.  I'm going
to lower the base offense to 36.  I think that gives even the
defendant the benefit of the doubt -- to which he may not be
entitled -- but I think there's clearly 15.  I can see the
argument that it may not get all the way to 45.  So I am going
to give you a two-point reduction, not the full four that you
asked for.  I'm going to apply a base level of 36.

Now, that gets us, then -- well, you have one other
objection.  Let's take it up before we get to the final.  Did
you want to be heard on your objection to 49 which is the
adjustment for organizer, leader, manager, supervisor?

MR. O'BRIEN:  Briefly, Your Honor.

I mean, Your Honor, I would simply point out that --
and I don't believe the government would allege necessarily
that Mr. Van Pelt had any control over Ms. Harmon, Mr. Friend
or the people that were in that side of this situation.  I
believe -- I mean, certainly I know the government will
correct me if I'm wrong -- that Mr. Van Pelt's leadership role
is because of his alleged relationship with Mr. Stienbarger
and Mr. Malen and I would say, you know, I don't think any
evidence was provided that -- that Mr. Van Pelt had control

1    over them in any sort of, you know, boss/employee way.

2            I mean, they did engage in this conduct together.  I

3    would suggest that -- I mean, they assisted each other in the

4    distribution of these drugs.  Mr. Stienbarger would go get

5    them and bring them back and what have you and Mr. Malen would

6    assist in giving Ms. Harmon drugs.  But absent that

7    assistance, I don't think a leadership role was demonstrated

8    by the evidence.  So that's our objection to the leadership

9    role.

10           And I think it's more pertinent because this

11   investigation focused primarily on the Harmon drug trafficking

12   organization, of which I don't believe Mr. Van Pelt, Mr. Malen

13   or Mr. Stienbarger had a really foundational role in.  So the

14   assertion that that creates that they had a leadership role in

15   that organization I don't agree with.  I mean, they did

16   participate as far as giving drugs to that organization but to

17   say they had a leadership role, I think it connotes something

18   that's not there.  That would be my objection there.

19           THE COURT:  Mr. Eggert.

20           MR. EGGERT:  Briefly.

21           We think the leadership role was properly applied in

22   this case.  There are two examples that I indicate in my

23   sentencing memorandum that are also referenced in the

24   presentence report.  The first is the August 19th, 2014,

25   transaction involving Mr. Stienbarger.   Mr. Stienbarger's own

18

statements in the PSR indicate he was told to go there by
Mr. Van Pelt. Mr. Van Pelt directed that transaction and he
instructed Mr. Stienbarger to complete it. That Indicates a
degree of control on the part of Mr. Van Pelt over
Mr. Stienbarger.

The second transaction that I think is pertinent to
this determination is the November 15th, 2014, transaction
where Ms. Harmon actually picked up a quantity of
methamphetamine from Mr. Van Pelt but she was light; there was
not enough methamphetamine for what she had paid for and so
she had to go back to the residence -- Mr. Malen's
residence -- to get more methamphetamine. And there's phone
conversations that are referenced in the PSR and also
referenced in the sentencing memorandum where Mr. Van Pelt
told Ms. Harmon that Brandon will take care of you; Brandon's
the guy; he's my guy; he's working on the situation for me,
clearly indicating, at least in Mr. Van Pelt's mind, a degree
of custody and control over Mr. Malen.

On page 6 of the sentencing memorandum I lay out the
legal basis for determining whether or not a person should be
given this type of enhancement. And I would point out that
this enhancement that's being given is the enhancement under
3B1.1, Subsection C. It's the most broadest and most
narrowest of -- correction -- the broadest and the shallowest
in terms of the amount of time that can be given of all the

1  enhancements.  Only a two-point enhancement is given under

2  Subsection C.  In order to determine whether a defendant is a

3  manager or supervisor, the defendant need only have exercised

4  some degree of control over others involved in the commission

5  of the offense where he must have been responsible for

6  organizing others for the purpose of carrying out the crimes,

7  which I clearly think he did in terms of Mr. Malen and

8  Mr. Stienbarger.

9            And I'd also point out to further highlight the

10  point here that in addition to these two transactions I've

11  referenced, the Court's already referenced in Paragraph 28 of

12  the presentence report Mr. Stienbarger's statements that he

13  traveled to Kansas City to pick up methamphetamine and also to

14  pay United States currency to the supplier of the

15  methamphetamine on the behest of Mr. Van Pelt.  So I think in

16  this particular circumstance the enhancement is properly

17  applied and the objection should be overruled.

18            THE COURT:  The Court's going to overrule that

19  objection.  I think that the two-level enhancement is

20  appropriate.  Had there been one of the higher ones, we might

21  have been able to argue about but I think the two points is

22  appropriate.

23            So in essence the Court has sustained in part

24  defendant's objection to Paragraph 46 by reducing the base

25  offense level two points.  I have overruled the defendant's

20

1    objection to 49 and will leave that two-point enhancement.  I

2    believe that's the only objections that affected the offense

3    level.

4              MR. O'BRIEN:  Yes, Your Honor.

5              THE COURT:  So that leads us, then, with that

6    reduction to a 35 offense level?

7              MR. O'BRIEN:  Yes, Your Honor.

8              MS. POTTER:  That's correct, Your Honor.

9              THE COURT:  All right.  So applying that chart that

10   I talked about earlier, if I go to 35 and a criminal history

11   of four, that makes the guidelines 235 to 293.

12             MS. POTTER:  That is correct.

13             THE COURT:  Does that affect the supervised release

14   or the fine?

15             MS. POTTER:  No, Your Honor.

16             THE COURT:  So the Court then will adopt an offense

17   level of 35, a criminal history of four, and a guideline

18   sentence of between 235 and 293 months.

19             I guess earlier I messed up and I didn't read the

20   other counts to which the defendant pled guilty.  Let me go

21   back and do that.  I didn't realize.

22             Count 48, do we agree that the

23   statutorily-authorized sentence is not more than 30 years in

24   prison, not more than a $2,000 fine, not less than six years

25   supervised release?

| | |
|---|---|
| 1 | MR. EGGERT: The government does, Your Honor. |
| 2 | THE COURT: And payment of $100 special assessment? |
| 3 | MR. EGGERT: Yes, sir. |
| 4 | MR. O'BRIEN: Yes, Your Honor. |
| 5 | THE COURT: Then on 55, possession with intent to |
| 6 | distribute 500 grams or more, it's a Class A felony and the |
| 7 | sentence there is not less than 20 years and as much as life |
| 8 | imprisonment, supervised release ten years to life, a fine of |
| 9 | $20 million, up to, and $100 special assessment? |
| 10 | MR. O'BRIEN: Yes, Your Honor. |
| 11 | MR. EGGERT: Yes, Your Honor. |
| 12 | THE COURT: I apologize for not covering those |
| 13 | earlier. All those are included in the offense level but the |
| 14 | guideline is 235 to 293 with supervised release of at least |
| 15 | ten years on Counts 1 and 55, four years on 27, and six years |
| 16 | on 48. |
| 17 | All right. Let's now talk about -- after all of |
| 18 | that numbers and argument, let's now talk about what's the |
| 19 | right sentence for this defendant within the law that we've |
| 20 | established; in other words, is there a reason to depart or |
| 21 | vary from the sentencing guidelines in this case. |
| 22 | Mr. Eggert. |
| 23 | MR. EGGERT: Thank you, Your Honor. |
| 24 | Your Honor, the government's recommendation that -- |
| 25 | the sentencing memorandum doesn't change as a result of the |

22

1   Court's determination today.  The government's still asking

2   for a sentence of 264 months which would be right in the

3   middle of the defendant's advisory guideline range as

4   currently determined by the Court.

5          THE COURT:  Let me stop you.  I just thought of

6   something.

7          MR. EGGERT:  I'm sorry.

8          THE COURT:  When I said the guideline range is 235

9   to 253, it's actually 240 to 253 because of the minimum

10  sentence.

11         MR. EGGERT:  Yes.  That's my second point is he's

12  going to get a sentence within the advisory guideline range

13  whatever the Court does in this case because of the statutory

14  minimum.

15         THE COURT:  That's right.

16         MR. EGGERT:  But I would not ask the Court to impose

17  the statutory minimum in this case primarily because I think

18  that doing so would be disproportionate in light of the other

19  defendants that the Court has currently sentenced in this

20  case.

21         Mr. Van Pelt was not a minor participant or even a

22  mid-level participant to this case.  He was one of the primary

23  suppliers of methamphetamine to this conspiracy group in the

24  months of August, September, October, and November of 2014.

25  Not only was he one of the primary distributors of the

Case 6:14-cr-03106-MDH   Document 969   Filed 06/08/17   Page 23 of 49

methamphetamine for the Harmon conspiracy group, he was also a person that distributed to other organizations.

Mr. Stienbarger's sale that took place in August of 2014 was to an entirely different group in St. Louis, Missouri, that had come down to purchase methamphetamine from Mr. Van Pelt.

Mr. Van Pelt was the real deal in terms of methamphetamine distributors. This is not an individual that was just running a small mom-and-pop operation. He was an individual that was engaged in a large-scale distribution of methamphetamine. That large-scale distribution of methamphetamine also caused Mr. Van Pelt to enlist confederates to help him. We've already talked about Mr. Malen and Mr. Stienbarger. In fact, because he needed a safe location for the storage of his methamphetamine, he enlisted Mr. Malen to provide his residence in Springfield, Missouri, for the purposes of the storage of that methamphetamine, a safe house that he knew Mr. Malen would be a person that would be good to use for a safe house because of Mr. Malen's lack of a criminal history.

So that's the first issue in this that the offense itself is so severe that it requires a severe punishment.

Secondly, the defendant's history and characteristics also indicate that it requires that he receive a severe punishment. This is not the defendant's first conviction for controlled substance violation. In fact,

24

1    that's why he's facing a 20-year mandatory minimum sentence.

2    The defendant's history shows that he has a serious problem

3    not only with the use of controlled substances but also with

4    their distribution.  He also has convictions for receiving

5    stolen property, forgery, burglary, possession of misdemeanor

6    amounts of marijuana, as well as possession of

7    methamphetamine.

8           He has a 25-year history of substance abuse.  This

9    is an individual that's been given an opportunity to

10   rehabilitate himself, has not taken advantage of that

11   opportunity.  In the process of not taking advantage of that

12   opportunity, he's actually become a more significant and

13   severe threat to the community's safety by his actions.  I

14   think that's reflected not only in the amount of

15   methamphetamine that he sold but also introducing

16   methamphetamine into that community where Mr. Malen's house

17   was, impacting that entire neighborhood; every one of those

18   neighbors who had to deal with that safe house where

19   methamphetamine was being sold and stored and all the traffic

20   that comes with it and all the other criminal law violations

21   that come from having a place such as that.  That's Mr. Van

22   Pelt that did that, much more than Mr. Malen.  Mr. Malen

23   provided the spot, Mr. Van Pelt provided the drugs and

24   provided the reason for it to even be there.

25           So in addition to the type of offense, in addition

25

to the characteristics and the nature of this offender, there
is also the issue about sentencing disparities. This is where
I think really I feel very strongly that he should not get a
sentence of 240 months.

Today Mr. House received a sentence of 240 months.
Mr. House was a mid-level distributor. He also had a prior
felony conviction. Mr. House, just as Mr. Van Pelt, did not
wish to cooperate, which is his choice. But as a result of
that refusal to cooperate, he was -- he faced a mandatory
minimum. But when you compare Mr. House to Mr. Van Pelt,
Mr. House is a mid-level distributor in the middle of the
conspiracy. While I don't minimize what Mr. House did, it
does not compare to what Mr. Van Pelt did who's at the very
apex of the conspiracy providing the methamphetamine that
Kenna Harmon then supplies to Mr. House and others beneath
her. So to give them the same kind of sentence would indicate
that they're equivocal in nature and in conduct but that's not
at all what happened in this case. So I think Mr. Van Pelt
deserves a sentence more significant than what Mr. House is
going to receive.

I also will point out that we still haven't
sentenced Ms. Harmon or Mr. Friend, the last two main
distributors in this case. I would anticipate that the
government is going to ask for a sentence that's more severe
for Ms. Harmon but I would say Ms. Harmon and Mr. Van Pelt are

26

somewhat equal and so I'm not sure -- depending on what happens here today what I ask for Ms. Harmon because I want to keep them proportionate in nature.

Mr. Friend, because he's intending to go to trial, is looking at mandatory life. That's going to be his sentence if he's convicted at trial. So I think a sentence of 264 months as it relates to people that have already been sentenced and those people that are going to still be sentenced falls right within the level of proportionality necessary for a fair and just sentence in this case.

Mr. Van Pelt, he received a little bit of mercy today from the Court. I appreciate what the Court did here and I also agree with the facts of the case. I think that that was a justified decision by the Court, but he deserves no more mercy than that. He should be given a sentence not only within the guideline range but also a sentence that reflects his role in this case and that, in the government's opinion, is a sentence of 264 months.

Thank you.

THE COURT: May I -- I want to talk to you a little bit more about relative sentencing. And I understand Friend and Harmon, who are the two leaders, are left, but I also notice that -- and you may not know this on the top of your head, I'm not trying to put you on the spot -- but we have David Miller who has a guideline range, at least based on

27

1 presence report alone, of 360 months and is a criminal

2 history six, we have Hoffman that has a guideline range of

3 life who's a criminal history six. Seemed like we had another

4 one. Canales.

5     MR. EGGERT: Canales.

6     THE COURT: And McClanahan.

7     MR. EGGERT: Yeah.

8     THE COURT: Where do those people fit in compared to

9 Friend, Harmon and this defendant?

10     MR. EGGERT: That's a good question, Your Honor.

11 The first person that you mentioned was Mr. Miller.

12 Mr. Miller was a mid-level distributor. I don't want to give

13 too much in the way of the cooperation of each particular

14 defendant but some of these defendants cooperated.

15     THE COURT: Some of those I'm talking about may

16 be --

17     MR. EGGERT: Some are downward departure motions,

18 some are not. I do not anticipate that Mr. Miller will

19 receive a sentence of -- I'm not going to be asking for a

20 sentence of 30 years on Mr. Miller. I would anticipate based

21 on what I know of that case a sentence of between 15 to 20

22 years which would be less than what Mr. Van Pelt gets. I

23 think that that's justified not only by what Mr. Miller's

24 actions are in this investigation but also his role, where he

25 falls in the conspiracy.

28

1          Mr. Friend, Ms. Harmon we've already talked about.

2    Mr. Hoffman.  I think Mr. Hoffman is a bad fellow as well.

3    I'm not quite sure what I'm going to do with Mr. Hoffman but

4    he also is probably not going to be looking at 30 years

5    either.  It's going to depend in large part on his continued

6    work in his case as well as where these other defendants are

7    getting sentenced by the Court.

8          THE COURT:  I'm trying in my own mind to make sure

9    we're fair with all these people.

10         MR. EGGERT:  Judge, I don't want to cast prophesy in

11   a way that's going to come back on me incorrect but Kenny

12   Friend is going to be the highest defendant sentenced in this

13   case by far.  If he goes to trial and he's convicted, his

14   sentence by statute is mandatory life.  I would anticipate

15   Kenna Harmon's sentence when she gets sentenced will be

16   between 20 to 25 years depending on what happens here today

17   because I want to be fair to her just as I try to be fair to

18   Mr. Van Pelt.  Then after that I think the other defendants

19   that you mentioned are all going to be looking at between 20

20   to 15 years will be the range that they're looking at.

21         THE COURT:  Thank you.

22         MR. EGGERT:  Does that make sense?

23         THE COURT:  It does.  Gives me perspective.

24         Mr. O'Brien.

25         MR. O'BRIEN:  Your Honor.

29

1          Your Honor, as the Court knows, there's a 240-month
2     minimum sentence in this case.  Mr. Van Pelt understands that.
3     One of the prior -- one of the primary reasons that we believe
4     that that's an appropriate sentence and one reason we're
5     asking for it is based on Mr. Van Pelt's criminal history.  He
6     is criminal history level four.  He does have some prior
7     offenses.  Obviously he has one prior offense for possession
8     of methamphetamine.  We would note for the Court that that
9     dates back to 2003, so nearly -- over ten years, and it
10    involved a personal use amount of methamphetamine.
11         With regards to the burglary charges that also drive
12    up his sentence in this case, they involve conduct that he was
13    involved in as a teenager.  It is unfortunate, it's a terrible
14    situation, but we do believe that because those convictions
15    and those prior offenses are so remote that they do somewhat
16    overstate his criminal history.  Particularly the 851, Your
17    Honor, which obviously the government has every right to file
18    whatever charge they can against any defendant they can
19    charge, but in this case, you know, it is significant because
20    it's not a prior distribution-related offense.  It's a prior
21    possession offense of someone who has a long history of drug
22    use and drug addiction.
23         I know the Court's reviewed these letters and they
24    seem -- from Mr. Van Pelt's family -- that he has many
25    positive qualities.  He's not an evil person but he does

struggle mightily with substance abuse.  He's gone through
periods of life where he tried to stay clean, he's fallen back
into the traps of methamphetamine.  This has cost him
relationships with his family, it's cost him relationships
with his children, it's cost him his own, you know, ability to
be a functioning, productive member of society.  But the
primary driving force behind this is the addiction, Your
Honor.  So because of that we believe that a sentence at the
low end of the guideline range in this case -- not even really
below any of the guidelines range since the 851 brings the
sentence up -- would be appropriate.

        In addition, Your Honor, I think when you look at
the proportionality of this, that's important, obviously, in a
case -- in a large conspiracy case, how did people play, what
are people's roles in these kinds of, you know, conspiracies,
well, I certainly don't believe that Mr. Van Pelt is on equal
footing with Kenna Harmon.

        Now, I realize that Mr. Van Pelt, you know, is
portrayed as sort of the top of the pyramid in this situation
but when you look at this situation, Your Honor, Mr. Van Pelt
met Ms. Harmon for the first time in August of 2014.
Ms. Harmon had been involved in this conspiracy for years.
She had made hundreds of thousands of dollars, was building
homes, palatial homes in this community with drug money.  Her
husband had already been arrested and federally indicted for

his own drug trafficking conspiracy and Kenna Harmon continued on. So to compare Mr. Van Pelt to Ms. Harmon to me doesn't really add up. So I would like to draw that distinction between Mr. Van Pelt and Ms. Harmon as far as being a leader in this.

Mr. Van Pelt before being arrested did not know Kenneth Friend, nor did he know anyone else who was involved in this. So while it doesn't mitigate necessarily his conduct, I think the Court should recognize that his involvement as part of this drug trafficking organization was fairly limited compared to everyone else, even Brandon House, Your Honor, to a degree, who I know was sentenced today, again, to 20 years. But 20 years, Your Honor, because of the 851, not because it was necessarily because of his conduct in the conspiracy, was involved the entire length of the conspiracy. He was in from day one. So very different from Mr. Van Pelt.

Your Honor, also when we look at some of these other players, I believe in the PSI Mr. Miller is identified as an upper-level participant in the conspiracy rather than a mid-level participant. So I would just bring that to the Court's attention. But, again, you have people with greater criminal histories, longer involvement in the conspiracy and they're getting all over the place on these sentences.

You have Carlos Tapia. Again, the only upper-level

32

1  participant to my knowledge that's been sentenced so far

2  received 108 months in this case.  Now, I understand that, you

3  know, everybody brings their own individual situations to

4  sentencing but to say, Well, we're going to basically have a

5  pecking order on how we work out these sentences and, you

6  know, based on your role you need to be bracketed here and

7  bracketed there, that's a perspective, first of all, I

8  wouldn't agree with.  I think sentences should be individual

9  to the person.  But also it's -- falls in this case because of

10 the 851s.  The 851s do not allow the Court to weigh individual

11 conduct or individual participation.  The 851s basically drive

12 up the potential upward range of sentences, average sentences

13 in this case because they have that 20-year mandatory minimum.

14        Your Honor, when you look at this situation, I

15 believe a 20-year sentence would be sufficient.  Mr. Van Pelt,

16 again, going in on a 20-year sentence will be in his 50s when

17 he's potentially released.  That's followed by potentially a

18 life sentence on supervision by the Court but at a minimum ten

19 years.  He's in his 60s.  So you look at these letters that we

20 received, Your Honor, Mr. Van Pelt, you know, may or may not

21 realize this now, but he will never have a normalized

22 relationship with his children, he will never have a

23 normalized relationship with the kids who wrote in on his

24 behalf who he has had a positive influence on.  He will never

25 have a normalized relationship with his father going forward.

1   I mean, he will face punishment with a 20-year sentence,

2   extreme punishment, extreme loss. Relationships that he's

3   fractured in his life will disintegrate. Again, maybe that's

4   something that doesn't come home yet but five years, ten years

5   down the line, it will.

6        So we believe, again, that a 20-year sentence is

7   sufficient. We believe the safety of the public is guaranteed

8   by the supervised release. When you look at Mr. Van Pelt's

9   history and his involvement in this, no guns were involved, no

10  violence was involved on his part, you look at his criminal

11  history, again, no violence, no guns.

12       You know, Mr. Van Pelt has done considerable wrong.

13  He's hurt people, obviously, Your Honor, because the

14  distribution of these kinds of drugs hurt people. However,

15  when you look in this case at his involvement, at his

16  participation, when you look at him individually with his

17  criminal history and you look at what kind of sentence could

18  be crafted by the Court to protect the public as well as meet

19  the ends of justice, we believe a 240-month sentence would do

20  that.

21       Your Honor, I don't believe I have anything else

22  but we are asking -- Mr. Van Pelt would like to make a

23  statement to the Court.

24       THE COURT: He may do so at this time. He can just

25  make his statement from back there.

34

1          You can stand, please.

2          THE DEFENDANT:  Your Honor, I ask you to bear with

3   me because I'm nervous and --

4          THE COURT:  That's fine.  We're not in a hurry.

5   Take your time.

6          THE DEFENDANT:  Okay.  I'd also like the Court to

7   know that this letter was probably the hardest thing I've ever

8   done to be able to sit down and be honest with myself and --

9   anyway, I'm just going to read it and go from there.

10          I said, "Over the past two and a half years this

11  very moment has played over and over in my head.  I tried to

12  think of the right words to say, words that articulate my true

13  sincerity, something different than every other defendant

14  who's standing before this Court facing a life sentence hasn't

15  already said or wouldn't say in hopes to sway the Court's

16  opinion, whether sincere or not.  Logically it seems like

17  anyone standing before you in a situation is going to say

18  exactly what he thinks you want to hear.  But there's one

19  thing that I'm confident about today is that you've heard it

20  all, from every line and every book, so brutal honesty is the

21  route that I'm taking.

22          "I wish I could stand here and tell you that

23  throughout my life I've been mostly a good guy that's

24  occasionally done some bad things and I guess if that were the

25  case, I wouldn't have a problem standing up here listing off

35

all my positive accomplishments maybe shadowed by a few bad
decisions.  Unfortunately for me, that's not the case.  Taking
the time to reflect on my life and doing an honest moral
inventory, I have to say that I've mostly been a bad guy who's
occasionally done some good things.  I say this because for me
in order to hold myself accountable, I had to recognize myself
honestly for the type of person I've been along with the bad
decisions that I've made before I can sincerely start making a
change.

Back in 1996, 1997 I was charged with several counts
of burglary and stealing.  Before I ever pled guilty and was
sentenced, I had some long in-depth conversations while
sitting in the county jail with a man named Robert Driscoll
who was there on appeal from death row.  I remember him asking
me what it was that I thought gave me the right to break into
someone's home and take something that they worked hard for
and didn't belong to me.  The only answer I had was is that I
don't have that right.  He then asked me how I'd feel if
someone did that to my parents or someone in my family.  My
response was I wouldn't feel good at all about it.  Almost
instantly I started having feelings of guilt, shame and
remorse and I knew at that moment that I would never again
take something that didn't belong to me.

"At that time I was 17 going on 18 years old.  I
didn't stop stealing because it was against the law, I stopped

36

1  stealing because I became a more responsible young man.  And I
2  can say without a doubt before this Court and my family and
3  God that I've never taken -- I've never broke into anything,
4  stole anything or told someone that it was okay to do so since
5  then.  Once I made that decision internally, I never gave it a
6  second thought.

7  "I wish it was that easy for me when it came to
8  using meth.  I wish it were as easy to quit using meth as
9  knowing right from wrong, and if it were, I would've quit a
10  long time ago and wouldn't be standing before this Court in an
11  almost impossible position, or so it feels.  How is it
12  possible that I've allowed a substance, something with no
13  brain, to have so much control over me?

14  I know better than anyone that using alone is not
15  what has me standing here before this Court facing a
16  20-to-life sentence but using is how it began.  I
17  unfortunately became an addict with a means, which in turn for
18  me was a means to an end.  Even up until the day of my arrest,
19  I was an addict first.  With the start of each day I was an
20  addict before I was a father, I was an addict before I was a
21  son, a brother, and friend and I was definitely an addict
22  before I was a drug dealer.  Everything revolved around my
23  addiction.

24  I've been clean for two-and-a-half years and to
25  think that I was so irresponsible and unthoughtful that I

37

1    allowed myself to wake up on a daily basis and put drugs -- a

2    substance, something without a God-given heart and soul --

3    before my children, before my dad and mom, brother, sister,

4    and loved ones makes me sick to my stomach and with words

5    alone I can't express how sorry I truly am for being that guy.

6            "To the Court I'd like to say that although I know

7    my addiction is what led up to this point, that in no way do I

8    believe that the severity of my addiction excuses me or gives

9    me even the slightest bit of justification for the crimes that

10   I committed.  In my PSR under Victims' Impact it states no

11   identifiable victims.  I couldn't disagree more.  As I will

12   most surely be held accountable by this Court today, I am also

13   holding myself accountable for any pain or harm that I caused

14   my family, friends, other addicts along with my community who

15   are all victims of my drug abuse and the decisions that I

16   later made to fuel that abuse which brought us here in this

17   moment.

18           "Comparing this situation and the trouble that I'm

19   currently in to other times I've been in trouble in the past

20   is like comparing myself to being pulled over on the

21   interstate for speeding 80 mile per hour in a 70-mile-per-hour

22   zone, then getting a ticket or maybe even a warning before

23   being sent on my way to waking up in a hospital bed after

24   being in a coma for two-and-a-half years with my family by my

25   bedside finding out that I was in a 29-person pile-up on the

38

interstate because I was speeding thinking, Oh, my God, what
did I do, except standing here before all of you as remorseful
and as humble as I could be, I know exactly what I've done.
It doesn't get more severe or serious than this right here.

I use that analogy hoping that I'm able to project
to the Court and to my family, in case they're wondering,
what's different about this time than the other times. There
just is no comparison from this time to another time. My
whole thought process is different. Regrettably and
unfortunately it took something this severe in real time for
me to fully start understanding how selfish, irresponsible,
and dangerous that my addiction left unchecked had become.

"To my family, I thank you all for your
never-ending, unconditional love and support. Through all my
mess-ups through all these years, you never wavered and I'm
undeservingly blessed to be able to call you my family. Words
alone can't express how sorry I am for letting you down but so
grateful that you are here today still standing beside me."

I don't know -- just a second.

"Thank you for not giving up on me. I promise you
with all my heart that I'm not going to give up either. I
can't change the past and this is going to be a long road but
I'm going to do my best to take every opportunity afforded me
to better myself during this time so that some day I can
hopefully be a positive asset to my family's legacy.

1     "Your Honor, hopefully I wasn't too long-winded but
2     I hope that I was able to convey my heart and words with
3     sincerity effectively to you and this Court. I know that by
4     law 240 months is the lowest possible sentence that I can
5     receive today. Flip side of that coin is anywhere between
6     that and a life sentence. I'm not asking for leniency, Your
7     Honor. If anything, I ask for your mercy, if not for myself,
8     for my family that are sitting behind me and the ones that
9     aren't here."
10    With that, I want to thank you for your time and
11    consideration.
12    THE COURT: Anything further either party wants me
13    to hear before I make a decision?
14    MR. EGGERT: No, Your Honor.
15    MR. O'BRIEN: No, sir.
16    THE COURT: Mr. Van Pelt, if you'd stand.
17    I promised you I'd -- I'm going to announce your
18    sentence but I'm also going to reflect. I want to tell you
19    that the longer I'm on the bench the more convinced I become
20    that it's not fair to label people good people or bad people
21    because some really good people do some bad things and some
22    people that seem to be kind of bad do some really good things.
23    I'm not here to make that judgment. What kind of person you
24    are the rest of your life is something you're going to
25    determine. It's going to be defined based on what you do and

how you act.

I'm touched by the letters I received. Clearly have been very positive in the lives of some people and they were very articulate letters. Let me say you're an articulate guy, too. The presentence investigation indicates you've not yet received your GED, is that correct, or has he received it?

MR. O'BRIEN: He's received a GED, Your Honor. That was a correction we were going to ask the Court to consider after his sentencing.

THE COURT: Okay. Good, because he's clearly articulate and education is something he should pursue.

Well, you got off to a bad start and you haven't been able to get out of that rut, it looks like. I do note it looks like the offense -- the possession of methamphetamine in Phelps County that you got at age 25, that you ultimately were discharged from that sentence. I think you got paroled and then got sent back. But it was in July of '07 and you were arrested for this offense in November of '14, although I think you got involved, I think everybody agrees, in September of '14. So you made it seven years. What a shame that you got yourself back into it because you have gifts to give people and you have positive things to contribute to society.

The law is the law and you're facing the minimum 20 and that should tell you what the U.S. Congress has heard from constituents about methamphetamines and the impact on people's

41

```
 1    lives, and indeed you walk in the courtroom today at this

 2    moment facing a possible life sentence.

 3           I say this in a lot of methamphetamine sentences but

 4    it always instructs me that knowing what methamphetamines have

 5    done to your life -- and you told me that you were --

 6    articulately that you were an addict first; an addict before a

 7    brother, an addict before a father -- why you would want to

 8    put other people in that position and yet by selling

 9    methamphetamines you were simply facilitating other people's

10    addictions, getting themselves into that situation.

11           And there are victims, you're correct.  You're one

12    of them.  You're a victim of methamphetamine.  Your family,

13    your loved ones are victims of methamphetamines.  The 29

14    defendants in this conspiracy are all victims of

15    methamphetamine use and addiction.  And all the people you

16    sold to -- or that were sold to, not just the ones you sold

17    to -- have had their lives adversely impacted by

18    methamphetamine and by your conduct.

19           I am -- I just learned about how strong that

20    addiction must be if it would cause you to do to other people

21    what you've done to yourself knowing how miserable that

22    addiction is, and that is why the people have cried out and

23    that's why Congress has passed tough laws.  There are many who

24    argue that the long sentences that are attributed to

25    methamphetamine sales and conspiracies are not the appropriate
```

42

1   approach and not the solution to the methamphetamine problem.

2   In this courtroom, that debate is not one that is appropriate;

3   that's got to happen in the Congress.  So if people think that

4   drug sentences are too long, that a different approach ought

5   to be taken, they need to be talking to their congressmen and

6   senators because here in court my job is to enforce the law,

7   not to rewrite it.

8          I do think what you've done deserves punishment

9   under the law.  I think what you've done, we need to send a

10  message to others, even if they're addicts, to let them know

11  the serious consequences they face.  So to the extent those

12  are factors relevant to sentencing, and they are, as described

13  in the law, I have to consider those.  I also have to look at

14  your criminal history.  And while I agree with your lawyer

15  that it's -- started young and it's not as recent as some we

16  see, I'm appreciative it doesn't include violence, which means

17  your sentence will be lower than it would have been otherwise,

18  or at least a gun even.

19         You have had chances to turn your life around before

20  and you didn't do it.  And regret doesn't do you any good,

21  positive change does, but it's something I have to consider

22  because I have to consider whether you would be a risk to the

23  public to get back into methamphetamine and sales.

24         It's interesting, you were not in this particular

25  conspiracy for long and I don't know of any prior connection

43

1    with Harmon or Friend or the other leaders but I do know that
 2    you're the one who knew the connection to the supplier in
 3    Kansas City, and that's of concern.
 4          In comparing you to some of the other people we've
 5    sentenced -- and I'll not talk about specific cases other than
 6    to say some of those people cooperated with law enforcement
 7    and told them everything they knew to help law enforcement to
 8    try to shut down the system higher up the chain.  Others chose
 9    not to do that, which is their choice, but there is a
10    consequence to that and that is you sometimes face more
11    difficult sentencing issues.
12          Trying to fit everybody in a place I think is
13    appropriate because we don't want unfair sentencing but that
14    has to reflect each individual person.  So I understand what
15    your lawyer was saying is we can't disregard the individual as
16    we try to place where people fit, but I do think we need to
17    try to fit people in the sentencing pattern fair compared to
18    what they did.
19          Looking at you in this one, you certainly were in
20    there for a shorter period of time but you were a source of
21    large quantities of methamphetamine.  You did play a larger
22    role.  So here's what I've decided to do considering all those
23    factors I've just told you about.  Here's what your sentence
24    is going to be.  It's not exactly what the government wants
25    and not exactly what your lawyer wants.

                                    44

1    Pursuant to the Sentencing Reform Act of 1984, it's

2 the judgment of this Court that defendant Anthony J. Van Pelt

3 is hereby committed to the Bureau of Prisons for 252 months on

4 each of Counts 1, 27, 48, 55, all to be served concurrently,

5 for a total imprisonment of 252 months.  Upon release from

6 imprisonment the defendant will be placed on supervised

7 release for ten years.  This consists of 10 years on each

8 Counts 1, 55, four years on 27, and six years on 48, all will

9 run concurrently.  I'm not going to impose any fine, you don't

10 have the ability to pay one.  You will have to pay the United

11 States a special assessment of a hundred dollars on each of

12 the four counts, 1, 27, 48, 55, for a total of $400 which is

13 due immediately.

14    I have that -- is there a preliminary order of

15 forfeiture?

16    MR. EGGERT:  I did not see that.  He did admit to

17 Forfeiture Allegation 8.  It could have been that the

18 forfeiture was administratively handled.  I'll have to check

19 with the forfeiture attorney when I get back to the office.

20 But I would ask --

21    THE COURT:  It's my intent to finalize any

22 preliminary order of forfeiture that was --

23    MR. EGGERT:  Yes, that's what I would request, Your

24 Honor.

25    THE COURT:  While you're on supervised release

45

1  you'll comply with the mandatory and standard conditions that
2  have been adopted by the Court.  In addition, you'll comply
3  with the special conditions listed in Part D, Paragraphs 97 A
4  to D of the presentence investigation report.

5          This Court recommends that you be designated to an
6  institution for participation in the 500-hour residential
7  substance abuse treatment program.  That's the best program
8  that they have.  Nothing good is going to happen in your life
9  until you fully and finally get the substance abuse issues
10 behind you.  This is the best program the Bureau of Prisons
11 have.  I'm also going to recommend the UNICOR program.  That
12 allows you to do some job training.  I notice on the
13 presentence investigation report your employment history is
14 rather thin and you're going to need some job skills, so
15 hopefully we can get you some.

16         Yes, sir?

17         MR. O'BRIEN:  Your Honor, I don't know if the Court
18 can specifically mention some places.  Mr. Van Pelt has done
19 some research into places that have job training.

20         THE COURT:  Okay.

21         MR. O'BRIEN:  We would like the Court to consider
22 recommending Greenville, Illinois.  It has an HVAC and a
23 machinist educational program.  They also have an HVAC
24 vocational business program is Englewood, Colorado.  And then
25 they also have a program in Florence but -- for a barber

46

```
 1   program, Your Honor, so --

 2             THE COURT:  Where's the last one?

 3             MR. O'BRIEN:  Florence, Colorado.

 4             THE COURT:  Does your client wish me to encourage

 5   the Bureau of Prisons to make placement in one of those

 6   locations?

 7             MR. O'BRIEN:  Yes, Your Honor.  If the Court would

 8   oblige us on that, we would be greatly appreciative.

 9             THE COURT:  The Court -- obviously -- and I know

10   your client's probably been told this, but I don't decide what

11   prison you go to.  The Bureau of Prisons does.  But I am going

12   to recommend that they consider you for placement in

13   Greenville, Illinois, first, Englewood, Colorado, second, and

14   Florence, Colorado, third.  Obviously, all of those job

15   training issues are secondary to you getting the 500-hour

16   program in and out of the way.

17             You do have a right to appeal my sentence.  If you

18   want to appeal, you need to do so within 14 days.  If you

19   don't appeal within 14 days, you risk losing the right to

20   raise certain issues.

21             You understand the 14-day period, sir?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  Do you have counts to dismiss?

24             MR. EGGERT:  No, Your Honor.  The defendant pled

25   without an agreement in this case.
```

47

```
 1              THE COURT:  All right.

 2              Anything further I need to take up or consider?

 3              MR. O'BRIEN:  Your Honor, on the GED issue, Mr. Van

 4    Pelt did get his GED when he was in the Missouri Department of

 5    Corrections.  I believe that was verified by probation and

 6    parole but it was incorrectly stated on the front of the

 7    presentence investigation report.

 8              MS. POTTER:  Just for the record, Your Honor, on

 9    page 2, the education specifies no high school diploma or GED,

10    but in Paragraph 85 it does in fact verify that his GED was

11    obtained in 2000 and that was verified through the Missouri

12    Department of Corrections.

13              THE COURT:  I guess I saw the early and missed the

14    latter.  Let's make the record clear.  We will amend the

15    presentence investigation where it incorrectly indicates and

16    note that the defendant does have a GED.  That might impact

17    placement.  I'm not sure exactly how, but we want that

18    information to be correct.

19              MR. O'BRIEN:  Thank you, sir.

20              THE COURT:  Anything else?

21              MR. EGGERT:  No, Your Honor.  Thank you.

22              THE COURT:  All right.  Good luck to you, sir.

23              THE DEFENDANT:  Thank you, sir.

24              THE COURT:  We'll be in recess.

25              (Court stands in recess at 2:30 p.m.)
```

48

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2        I, Jeannine M. Rankin, Federal Official Court Reporter,

 3   in and for the United States District Court for the Western

 4   District of Missouri, Southern Division, do hereby certify

 5   that the foregoing is a true and correct transcript of the

 6   stenographically reported proceedings.

 7

 8

 9

10

11                        /s/ Jeannine M. Rankin

12   Date:      06/07/17      Jeannine M. Rankin, CCR, CSR, RPR

13

14

15

16

17

18

19

20

21

22

23

24

25
```